# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00445-CV

**Reza Seyed Alaghehband, Appellant**

**v.**

**Fariba Abolbaghaei, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. FM104439, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Reza Seyed Alaghehband appeals from a divorce decree naming appellee Fariba Abolbaghaei sole managing conservator for their daughter and ordering him to pay $800 a month in spousal support for three years. Appellant contends that the evidence is legally and factually insufficient to support the spousal maintenance award and that the trial court abused its discretion in appointing appellee sole managing conservator of the child. We will affirm.

### Statement of Facts

Appellee was born in and earned an engineering degree in Iran. She married appellant in January 1991, and they moved to the United States in September 1991. K.S.A., who is autistic, was born in April 1993. Appellee testified that appellant was very controlling, would not allow her to watch most television programs or have American friends, and required her to use credit cards for all her expenses and justify her purchases. Appellant disapproved of her desire to take English classes, so she learned it Athrough like TV.@ Appellee has never used her degree in the United States and has not applied for any engineering jobs in this country. She believed that her degree would not be recognized here because companies had rejected the degrees of friends who attended the same university. Appellee stayed home with K.S.A. until about two and one-half years before trial, when she started to work. Appellant was very angry the first time appellee went to work, and when she returned home, K.S.A. was upset and appellant Asaid that he beat my child.@ When appellee first started to work outside the home, appellant Asaid I am not allowed to do that. He just cut myCthe credit cards without me knowing that I was like using the credit card. It was like declined.@ At appellant=s demand, appellee changed jobs, but was injured in a car accident and had to quit. After she recovered, A[Appellant] was absolutely against me working and he was very controlling even more with money to stop me working.@ At the time of trial she was earning $10 an hour and working from twenty-five to forty hours a week at a part-time job in retail sales. She sought spousal maintenance so she could get a degree in marketing.

Appellee decided she wanted a divorce but waited two years to file because, AI didn=t know anything. I=ve been here for ten years. I didn=t know how the Americans are like, what the culture is like, where I am.@ Shortly after she filed for divorce, she planned to travel back to Iran with appellant and

2

K.S.A. until appellant told her, A[I]f you go to Iran he is going to say that I have had an affair with somebody and they are going to kill me for that.@ Appellant also told her he was going to take all the money from their account, Amake sure that I am going to become homeless through this divorce,@ and Ahe=s going to have custody of the child and he=s going to take it to Iran and never come back.@ Appellee moved out of the parties= home because, AHe was emotionally really abusing me. I wasChe always told me I=m nobody, I amCvery, very, very bad words each time I was coming from work. I can=t even say those words. He used a lot of bad words that nobodyCI=m not a good mother, so I was not able to handle those anymore.@

Appellee testified that when K.S.A. first began exhibiting unusual behavior, appellee sought to have her tested and given therapy, but appellant did not support those efforts. Appellee testified that she enrolled K.S.A. in therapy, only 70% of which is covered by insurance, and attended meetings at K.S.A.=s school; appellant only attended a few meetings. Appellee testified that she had volunteered with and educated herself about autistic children. Appellee and appellant agreed that appellant should help with K.S.A.=s school work because he was educated in the United States; appellee was to help K.S.A. with her social and speech problems. Because most of appellee=s work hours are in the evening, for the year before trial, appellant primarily helped K.S.A. with homework, made her dinner, and prepared her for bed. Appellee said when she tried to be more involved appellant often interfered. Appellee testified that she took K.S.A. to school most mornings.

Since she filed for divorce, appellant refused to let appellee see K.S.A. outside of his presence or to let K.S.A. speak with appellee=s family outside of his presence and blocked her visitation attempts over Christmas. Appellee testified that in K.S.A.=s presence appellant used bad language and

once shut her leg in a door hard enough to bruise it. According to appellee, appellant keeps K.S.A. out as late as 12:00 or 1:00 a.m. several times a week, even though she has to get up for school at 7:30 a.m. Appellee said her father had an Iranian company worth Amillions of dollars,@ but disputed appellant=s assertions that she had any financial interest in the company.

Appellant received two undergraduate engineering degrees and a masters degree from universities in California and Washington. Appellant testified that he owed about $600,000 to his father, mostly for school loans. In April 2001, appellant=s father said he needed to have the money repaid due to health problems, so appellant wired a large sum of money and wrote his father forty-five checks each in the amount of $10,000. Appellant only had $200,000 in the account on which he wrote the $450,000 in checks and he testified that he planned to take out loans for the excess; he denied having other funds hidden anywhere. Appellant said he did not know appellee had filed or was going to file for divorce when he began sending his father money. Appellant testified that before appellee started working, he and appellee both cared for K.S.A., but since she started working he has been K.S.A.=s primary care giver. Appellant asked that appellee only be allowed to see K.S.A. at school or in his home and that she be required to undergo a psychological evaluation and therapy.

Appellant earns about $8,200 a month; his statutory net resources are about $5,680. Appellant states that his and K.S.A.=s expenses total $8,323, including at least $3,500 in payments to his father. Appellee earns about $1,200 a month, her statutory net resources are about $1,040, and her monthly expenses total $4,670.

4

Sherrie Bevis, K.S.A.=s special education teacher, testified that K.S.A. is autistic and speech impaired. Bevis said changes in routines could be disruptive and it would Amake the most sense@ to schedule shared custody arrangements Aso that it was taking place over a period like during the summer when there=s not school when it wouldn=t be as disruptive to her education.@

After hearing testimony, the trial court named appellee sole managing conservator, named appellant possessory conservator, and granted appellant substantial visitation. The trial court awarded appellant the parties= home and another property in Austin, together worth about $160,000; two bank accounts worth approximately $2500; all interest in his employee retirement plan, worth about $52,000; several individual retirement accounts (AIRAs@) held in his name worth between $60,000 and $64,000, less about $26,000 awarded to appellee; two cars; and a checking account worth about $136,000, less about $65,000 awarded to appellee. Appellee was awarded two bank accounts in her name worth about $8,600; two IRAs in her name worth about $6,000; a checking account in her name worth almost $12,000; one car; and approximately $91,000 awarded to her from appellant=s assets. In total, appellant was awarded about $253,000 in real estate and financial assets and appellee received about $118,000. Both parties were ordered to pay their own attorney=s fees; appellant had incurred about $30,500 as of trial and appellee had incurred about $16,000.

**Standard of Review**

We review a trial court=s determination of conservatorship under an abuse of discretion standard. *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.CAustin 1997, no pet.). Likewise, we review a trial court=s award of spousal maintenance under the same abuse of discretion standard. *Lopez v. Lopez*, 55 S.W.3d 194, 198 (Tex. App.CCorpus Christi 2001, no pet.); *Alexander v. Alexander*, 982 S.W.2d 116, 119 (Tex. App.CHouston [1st Dist.] 1998, no pet.); *In re Marriage of Hale*, 975 S.W.2d 694, 697 (Tex. App.CTexarkana 1998, no pet.). A trial court abuses its discretion if it acts in an arbitrary and unreasonable manner or without reference to any guiding principles. *Doyle*, 955 S.W.2d at 479. A review of the legal and factual sufficiency of the evidence is subsumed into the review for an abuse of discretion. *Hale*, 975 S.W.2d at 697; *see Doyle*, 955 S.W.2d at 479 (in child support context, AUnder an abuse of discretion standard, legal and factual insufficiency are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion.@). The trial court is the sole judge of the credibility of the witnesses and may believe or disbelieve any evidence. *Burtch v. Burtch*, 972 S.W.2d 882, 888 (Tex. App.CAustin 1998, no pet.).

**Conservatorship of the Child**

In his third issue on appeal, appellant contends that the trial court abused its discretion in naming appellee sole managing conservator.

The family code provides that a trial court should appoint both parents joint managing conservators of a child unless the court finds that such an arrangement would significantly impair the child=s physical health or emotional development. Tex. Fam. Code Ann. ' 153.131 (West 2002). Factors in deciding whether the child=s best interest will be served by the parents= appointment as joint managing

6

conservators include: the child=s physical, psychological, or emotional needs; the parents= ability to put the child=s welfare first and reach shared decision in the child=s best interest; whether each parent can accept and encourage a positive relationship between the child and the other parent; and the parents= participation in raising the child before the divorce proceeding began. *Id.* ' 153.134(a) (West 2002).

Appellee testified that she cared for K.S.A. when K.S.A. was younger, even living in Iran with her parents for an extended period of time while appellant returned to the United States. There was evidence that appellant was excessively controlling and verbally abusive to appellee in front of K.S.A., had threatened to take her to Iran permanently, and had interfered with appellee=s attempts at visitation. Appellee testified that appellant was keeping K.S.A. up as late as midnight or 1:00 a.m. on school nights. Appellant wanted appellee to have only supervised visitation and asked that she be required to undergo a psychological examination. Bevis testified that joint custody during the school year could disrupt K.S.A.=s need for routine. Although Bevis indicated that a change in primary caretaker could be difficult for K.S.A., we cannot hold that, on this record, the trial court abused its discretion in finding that a joint managing conservatorship would not be in K.S.A.=s best interest. *See Doyle*, 955 S.W.2d at 479. We overrule appellant=s third issue on appeal.

## Spousal Maintenance

The court found appellee was eligible for maintenance and ordered appellant to pay $800 a month in spousal support for three years. Appellant contends that the evidence is legally and factually insufficient to support the trial court=s determinations that (1) appellee qualified for spousal maintenance, and (2) $800 was necessary to provide for appellee=s minimum reasonable needs.

7

A trial court may order spousal maintenance if (1) the marriage lasted at least ten years, (2) the spouse seeking maintenance lacks sufficient property, including any distributed in the divorce, to provide for her minimum reasonable needs, and (3) the spouse seeking maintenance clearly lacks earning ability in the labor market adequate to provide support for her minimum reasonable needs or is unable to obtain employment outside of the home because she is the custodian of a child who requires substantial care and supervision due to physical or mental disability. Tex. Fam. Code Ann. ' 8.051(2) (West Supp. 2003). A trial court should presume that maintenance is not justified unless the spouse seeking it has diligently sought suitable employment or has been developing necessary skills to become self-supporting while the divorce suit was pending. *Id*. ' 8.053(a) (West Supp. 2003). Once a trial court determines that a spouse should be awarded maintenance, it determines the amount and duration of maintenance by considering all relevant factors including: the spouses=education, employment skills, and financial resources, including property and liabilities apportioned in the divorce; how long it would take for the spouse seeking maintenance to acquire sufficient training or education; the requesting spouse=s age, employment history, earning ability, physical and emotional condition, and efforts to pursue available employment counseling; the duration of the marriage; acts of either spouse resulting in depreciation of the community estate; a spouse=s contribution to the education, training, or increased earning of the other; the contribution of a spouse as homemaker; and any marital misconduct of the spouse seeking maintenance. *Id*. ' 8.052 (West Supp. 2003). Section 8.052 is a Anon-exhaustive list of factors the court may consider@ in determining spousal maintenance. *Limbaugh v. Limbaugh*, 71 S.W.3d 1, 12-13 (Tex. App.CWaco 2002, no pet.) (discussing ' 8.052=s predecessor).

8

We will not disturb a trial court=s award of spousal maintenance if some substantive evidence supports the decision. *Lopez*, 55 S.W.3d at 198; *Hale*, 975 S.W.2d at 697.

There is sufficient evidence to support the finding that appellee is eligible for spousal maintenance. It is undisputed that the parties were married for more than ten years. The evidence supports a finding that appellee lacks the ability to support her minimum reasonable needs in this country: appellee=s engineering degree is not accepted in the United States, she has only recently learned to speak English, her work schedule must allow her to care for K.S.A., and she currently supports herself at low paying retail jobs that afford her a flexible schedule. Finally, there is evidence to support a finding that appellee=s assets, including those awarded in the divorce decree, were insufficient to provide for her minimum reasonable needs. Appellee=s monthly expenses were about $3,500 more than her monthly net income. She has incurred at least $16,000 in attorney=s fees. Many of appellee=s assets are not liquid or short-term assets.[1] Without assistance, it appears from the record that appellee would exhaust her liquid assets in less than two years. Appellant has not shown that the trial court clearly abused its discretion in finding appellee eligible for spousal maintenance. We overrule appellant=s first issue on appeal.

---

[1] Several of the assets awarded to appellee are retirement accounts, and the tax consequences and long-term financial consequences of early withdrawals render the liquidity of such assets problematic.

Appellant also attacks the sufficiency of the evidence supporting the trial court=s determination of the amount of spousal maintenance that he should pay. Appellant received almost twice as many financial assets as appellee, and he earns about $100,000 a year. Appellee is not fluent in English, having largely learned on her own because appellant interfered with her efforts to attend English classes. Appellee stayed home for about eight years and, when she sought employment, appellant interfered with those efforts. Appellee wants to earn a marketing degree in the United States rather than staying in retail, where she earns minimum wage. Appellee testified that appellant was financially controlling, interfered with her efforts to support herself, and threatened her life if she traveled to Iran. He also threatened to take K.S.A. away, empty the parties= bank accounts, and leave appellee homeless and destitute. Appellant claimed he is obligated to pay his father $3,500 a month, but the evidence did not clearly establish that the repayment plan was so structured. Appellant testified that he sent his father a large sum of cash in about April 2001 and $450,000 in checks when he only had $200,000 in his checking account. Appellant testified, A[W]hat we agreed was that I wire him whatever cash I have and the remainder I pay it over—you know, over—you know, in 45 checks, each one for $10,000.@ Although appellant testified that he did not know appellee was filing for divorce when he sent his father large sums of cash, the trial court was not bound to believe his testimony. *Burtch*, 972 S.W.2d at 888.

The trial court was the sole judge of the witnesses= credibility and demeanor, and we will not second-guess those determinations. *Id*. The determination of spousal maintenance is not made by way of a simple mathematical equation or a check-list of the factors enumerated in section 8.052, but Aa fact-specific determination that should be made by the trial court on a case-by-case basis.@ *Amos v. Amos*, 79 S.W.3d

10

747, 749 (Tex. App.CCorpus Christi 2002, no pet.) (citing *Hale*, 975 S.W.2d at 698); *see Limbaugh*, 71 S.W.3d at 12-13.  Appellant has not shown that the trial court=s award of $800 in spousal maintenance for three years was a clear abuse of discretion.  We overrule appellant=s second issue on appeal.

Having overruled appellant=s issues, we affirm the trial court=s judgment.


_____

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   May 1, 2003